IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RAUL URIAS,

        Petitioner,

vs.                                  No. CIV 00-1661 JP/LFG

IRMA LUCERO, Warden, and
PATRICIA MADRID,

        Respondents.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

1.  This is a proceeding on a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254,

filed November 22, 2000.  Petitioner Raul Urias ("Urias"), currently confined at the Western New

Mexico Correctional Facility at Grants, New Mexico, challenges the judgment and sentence entered

by the Fifth Judicial District Court in State v. Urias, No. CR96-132C (County of Lea, New Mexico),

on September 11, 1997.  Urias was tried and convicted by a jury on charges of trafficking cocaine

and conspiracy; he received concurrent sentences totaling nine years.

2.  On September 8, 1998, the United States Immigration and Naturalization Service ("INS")

issued its Final Administrative Removal Order, declaring Urias deportable at the conclusion of his

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

sentence pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii), for having committed an aggravated felony.

3.   Urias raises four claims in his federal habeas petition:  (1) ineffective assistance of trial counsel in failing to present an entrapment defense; (2) an erroneous ruling by the trial court in refusing to allow testimony by Urias' former attorney Orlando Quintana ("Quintana") regarding exculpatory statements made by petitioner's co-defendant; (3) insufficient evidence to sustain the conviction; and (4) denial of due process in INS proceedings.  Respondent argues that Urias' petition should be dismissed under 28 U.S.C. § 2254(d), as "[t]he issues raised in the petition were decided on the merits by the state courts."  (Answer, at 2).

<u>Factual and Procedural Background</u>

4.   Urias brought a direct appeal following his conviction, although he did not pursue the appeal to the state's highest court.  His trial counsel handled the appeal.  Two issues were cited in the docketing statement:  whether there was sufficient evidence to sustain the verdict, and whether the trial court erred in failing to allow evidence of the allegedly exculpatory statements made to attorney Quintana.  (Answer, Ex. D).  In a calendar notice dated December 11, 1997, the New Mexico Court of Appeals proposed summary affirmance on both issues.  (Answer, Ex. E).  Following Urias' memorandum in response to the calendar notice, the Court of Appeals reassigned the case to the general calendar and full briefing proceeded.  In his brief-in-chief, Urias addressed only the issue of exculpatory statements; he made no argument on the issue of sufficiency of the evidence.  (Answer, Ex. H).  The Court of Appeals affirmed Urias' conviction on January 25, 1999, in a published opinion which discussed only the issue of exculpatory statements.  <u>State v. Urias</u>, 127 N.M. 75, 976 P.2d 1027 (Ct. App. 1999).

5.   No petition for certiorari was filed in the direct appeal.  On March 1, 1999, approximately

two weeks after expiration of the deadline for seeking certiorari review, Urias' attorney Bruce A. Larsen ("Larsen") sent him a copy of the opinion of the Court of Appeals. Larsen's cover letter said nothing about filing a petition for certiorari. On March 23, Urias attempted to file a *pro se* motion with the state supreme court, seeking an extension of time within which to file a petition for writ of certiorari. Urias stated in this motion that he had been under the impression that his trial counsel was going to submit a petition for writ of certiorari. (Unnumbered pages of Record Proper, hereafter cited as "RP"). The motion was returned to Urias by the New Mexico Supreme Court, unfiled, on grounds the court could not accept a motion filed four months late. (Unnumbered exhibit to Petition for Habeas Corpus [Doc. 1]).

6. In the meantime, Urias' wife, Stella, was attempting to obtain trial tapes and was corresponding with Larsen and with the state Public Defenders' office, inquiring about the possibility of certiorari. (RP, at unnumbered pages, and unnumbered exhibits to Petition for Habeas Corpus [Doc. 1]). On April 22, 1999, Stella Urias wrote to attorney Larsen, noting that she had received correspondence from him containing a copy of the mandate of the court of appeals, but that "no copy of the petition for writ of certiorari which you had promised you would file was forwarded to me or my husband Raul. Would you please send me a copy for our file as soon as possible . . ." (RP, unnumbered page). On April 25, 1999, Stella Urias wrote to Phyllis Subin in the state Public Defender's office, stating:

> My husband a [M]exican national does not understand [E]nglish hardly, if any. And he had informed me that the last time he spoke to Mr. Larsen, I believe on the phone, that he was informed, or at least he thought, that Mr. Larsen would represent him on direct appeal through the N.M. S.Ct. on a petition for writ of certiorari in case his appeal was denied at the appeallate [sic] court level.

She explained that she tried to obtain tapes of the trial but was told by the court that only the Public Defender's office could obtain copies of the tapes, and she asked if Ms. Subin could help her obtain these copies.  Urias says the Public Defender's office never responded to this request for assistance. (Answer, Ex. L, at 3).

7.  On May 2, 2000, Urias filed a *pro se* petition for habeas corpus relief in state court, raising four issues:  (1) insufficiency of the evidence; (2) ineffective assistance of trial counsel in failing to present an entrapment defense; (3) ineffective assistance of appellate counsel, in that his attorney failed to file for certiorari following affirmance by the state court of appeals; and (4) the fact that his immigration status was incorrectly stated in documents issued by the Immigration and Naturalization Service (INS), and he was never given an opportunity for a hearing before an INS judge on this issue, was never given a chance to raise a hardship defense against deportation, and was never informed of any right to appeal the deportation order.  He added, "Presently, Petitioner brings this issue to this particular court for reason being that it appears he has no further judicial review of the issue.  There remains no other forum by which he can raise the issue."  (Answer, Ex. L).

8.  The petition for habeas corpus was denied by the state trial court, without discussion, three days after it was filed.  (Answer, Ex. M).  Urias' petition for a writ of certiorari, following denial of his request for state habeas relief, discussed the four issues noted in his original petition and added the claim of trial court error in excluding allegedly exculpatory evidence, which had been addressed on direct appeal but never brought before the state supreme court because of his attorney's failure to file for certiorari.  (Answer, Ex. O).  The New Mexico Supreme Court denied the application for writ of certiorari, without discussion.  (Answer, Ex. P).

4

<u>Claims One Through Three: Statute of Limitations Issues</u>

9.  Although the issue was not raised in Respondent's Answer, the Court finds *sua sponte* that Urias' Claims One through Three are subject to dismissal for failure to file his federal habeas petition within the appropriate limitations period.  28 U.S.C. § 2244(d)(1)(A) provides that a one-year period of limitation applies to an application for writ of habeas corpus by a person in state custody, and that the limitation period runs from the date on which the judgment became final by conclusion of direct review or expiration of the time for seeking such review.  None of the alternative accrual dates under 28 U.S.C. § 2244(d)(1)(B)-(D) applies in this case, as Urias has made no claim of any state-created impediment to filing the petition, the constitutional rights asserted were not of recent origin, and the factual predicates of Urias' first three claims were known, or could have been discovered in the exercise of due diligence, at the time of the verdict.

10.  The judgment and sentence in Urias' case, and an amended judgment and sentence, were filed on September 11, 1997.  (Answer, Exs. A, B).  Notice of Appeal was timely filed, and the New Mexico Court of Appeals filed its opinion affirming the conviction on January 25, 1999.  (Answer, Exs. C, J).  No petition for certiorari was filed in the direct appeal.  A certiorari petition is due 20 days after "final action by the Court of Appeals," defined as "the filing of its opinion with the Court of Appeals Clerk, unless timely motion for rehearing is filed."  N.M.R.A. 12-502(B).  There was no motion for rehearing filed in Urias' case; thus, "final action" by the state court of appeals took place on January 25, 1999, and Urias' petition for certiorari was due at the New Mexico Supreme Court on February 16, 1999.[2]  The 90-day period for filing a petition for certiorari with the United States

_____

[2]The twentieth day following January 25, 1999 fell on a Sunday, and the next Monday was a holiday; thus, the due date for Urias' certiorari petition was pushed up to Tuesday, February 16.  The three-day mailing period of NMRA 12-308(B) does not apply to petitions for certiorari to the court of

Supreme Court is not added to this period, because the direct appeal never reached the state court of last resort; *see*, Fitts v. Williams, 232 F.3d 901 (Table, text in Westlaw), No. 00-2175, 2000 WL 1480494, at *1 (10th Cir. Oct. 6, 2000).  Thus, February 16, 1999 was the date Urias' conviction became final for purposes of the statute of limitations on his federal habeas petition, and the one-year limitation period for filing a federal habeas petition expired on February 16, 2000.  He did not file his petition until November 22, 2000.

11.  The limitations period would be tolled by the filing of an application for collateral review in the state court.  28 U.S.C. § 2244(d)(2).  However, Urias did not engage in postconviction proceedings before the limitations period expired on February 16, 2000 (other than a motion for trial tapes and transcripts and a motion for free process, both filed on July 21, 1999 in anticipation of filing for habeas relief; *see*, RP at unnumbered pages), and the limitations period therefore expired without tolling.  Urias did file a petition for habeas corpus in the state courts, but this did not occur until May 2, 2000, well after expiration of the federal limitations period, so it had no tolling effect.  Thus, his federal habeas claim came too late.

12.  Equitable tolling is available in habeas cases to relieve an inmate of the limitations bar, if extraordinary circumstances over which he had no control made it impossible for him to meet the deadline.  Miller v. Marr, 141 F.3d 976, 978 (10th Cir. 1998).  However, in order to be eligible for equitable tolling, the inmate must diligently pursue his claims.  Id.  Urias notes in his petition that he expected his attorney to file for certiorari following affirmance by the court of appeals, and was surprised to learn that the attorney had not done so.  However, he does not claim that the attorney promised him he would pursue the appeal past the court of appeals stage, and he does not cite the

_____

appeals. NMRA 12-502(B).

attorney's failure to apply for certiorari as a ground for federal habeas relief based on ineffective assistance of counsel. The record makes clear that Urias and his wife began inquiring as early as April 22, 1999 about Larsen's failure to file for certiorari, and that Stella Urias was asking for assistance from the public defender's office shortly thereafter. Urias was informed by the New Mexico Supreme Court, in a letter dated June 2, 1999, that the court would deny his request for late filing of the cert petition. (*See*, multi-page Exhibit A to Petition for Habeas Corpus [Doc. 1]). Yet he inexplicably waited eleven months before filing a state habeas petition. This does not constitute diligent pursuit of his claims, and the Court finds that equitable tolling is not called for in this case.

13. Even if equitable tolling were appropriate, and if these three claims were not barred by the statute of limitations, they should be dismissed on the merits as discussed in the succeeding sections. As noted above, Respondent argues that Urias' petition should be dismissed under 28 U.S.C. § 2254(d), as "[t]he issues raised in the petition were decided on the merits by the state courts." (Answer, at 2). Although the issue of ineffective assistance of trial counsel was "adjudicated on the merits" in state court, full adjudication is not so clear with regard to the other claims. The Court therefore addresses the appropriate standard of review separately for each claim.

<u>Claim One: Ineffective Assistance of Counsel
In Failing to Present Entrapment Defense</u>

14. Urias contends that the trial would have resulted in a verdict of acquittal if his attorney had presented an entrapment defense, and that trial counsel was therefore constitutionally ineffective in failing to do so. Urias did not raise this issue in his direct appeal, which normally precludes the right to bring a claim in state postconviction review, <u>State v. Gillihan</u>, 86 N.M. 439, 524 P.2d 1335, 337 (1974), and constitutes procedural default which will generally bar federal habeas review. <u>Maes</u>

v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995).  However, claims of ineffective assistance of counsel are excluded from this general rule, Brecheen v. Reynolds, 41 F.3d 1343, 1363 (10th Cir. 1994), especially if the same counsel handled both trial and appeal.  Jackson v. Shanks, 143 F.3d 1313, 1318-19 (10th Cir. 1998).  The Court therefore finds that this claim was not procedurally defaulted.

15.  Urias raised the ineffective assistance claim in his state habeas petition.  That petition was denied at the trial level, and the state supreme court rejected certiorari, albeit without discussion in either decision.  In spite of the fact that the state courts rendered their decisions without stating any reasons therefor, the claim is considered to have been "adjudicated on the merits" by the state courts, and this Court will therefore analyze the ineffectiveness issue under the standard set forth in 28 U.S.C. §2254(d).  See, Aycox v. Lytle, 196 F.3d 1174, 1177-78 (10th Cir. 1999):

> a summary decision without even . . . cursory reasoning . . . can constitute an 'adjudication on the merits' for purposes of § 2254(d), provided the decision was reached on substantive rather than procedural grounds . . .  [W]e owe deference to the state court's result, even if its reasoning is not expressly stated . . .  Thus, we must uphold the state court's summary decision unless our independent review of the record and pertinent federal law persuades us that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence present.  This 'independent review' should be distinguished from a full de novo review of the petitioner's claims . . .  Our review is in fact deferential because we cannot grant relief unless the state court's result is legally or factually unreasonable.

The Court does not find the state courts' results, with regard to Urias' ineffectiveness claim, to be legally or factually unreasonable and therefore recommends that no habeas relief be granted on this claim.

16.  Urias was charged with and convicted of trafficking in cocaine and conspiracy to traffic.  In his habeas petition, he claims that he was entrapped in that he was lured by the police and by his

alleged co-conspirator, Rodrigo Marquez ("Marquez"), into involvement in a transaction involving the one-time sale of cocaine to undercover officer Toby Olguin ("Olguin").[3]  Urias contends that, shortly before the transaction took place, he "was at home with his wife and kids and had no intentions to buy nor sell any drugs to anyone"; indeed, "[t]here was no evidence at all at the trial that petitioner had ever once sold drugs of any sort to Marquez nor to anyone else."  (Doc. 1, at addendum pp. 2-3).

17.  Urias says he received a phone call from Marquez on the evening of the transaction, asking him to come over to Marquez' house; he does not say whether Marquez offered him any reason for this request.  (Id., at 3).  Urias states further that he did go to Marquez' home, along with his wife and children who waited in the car while he entered the home.  He recounts in his petition the events of the cocaine transaction, implying that any statements he may have made regarding the quality of the cocaine were the result of the undercover officer's attempts to elicit incriminating statements from him.  He contends that there were numerous drug charges pending against Marquez and his family, prompting Marquez to make a deal with the police, who "lured the unsuspecting petitioner who was not predispossed [sic] to buy or sell any type of drugs."  (Id., at 4-5).  Urias claims that, given these facts, his attorney should have raised an entrapment defense and was ineffective in failing to do so.

18.  To establish ineffective assistance of counsel, Urias must make a two-prong showing: (1) that counsel's performance was constitutionally defective; and (2) that the deficient performance prejudiced the defense, in that counsel's errors were so serious as to deprive the defendant of a fair

---

[3]This police officer's last name is sometimes spelled in the record as "Holguin."  The Court will refer to him as "Olguin."

trial with a reliable result.  Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *accord*, Rogers v. United States, 91 F.3d 1388, 1391 (10th Cir. 1996).  To prove deficient performance, Urias must overcome the presumption that counsel's conduct was constitutionally effective.  Duvall v. Reynolds, 139 F.3d 768, 776 (10th Cir.), *cert. denied*, 525 U.S. 933, 119 S. Ct. 345 (1998).  Scrutiny of counsel's performance must be "highly deferential" and must avoid the distorting effects of hindsight.  Miles v. Dorsey, 61 F.3d 1459, 1474 (10th Cir. 1995).  In order to be found constitutionally ineffective, trial counsel's performance must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy. Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997). Trial counsel's performance in this case was not "completely unreasonable."

19. In New Mexico, entrapment is a valid defense to a criminal prosecution.  State v. Romero, 79 N.M. 522, 445 P.2d 587 (Ct. App. 1968).  "Subjective" entrapment occurs "when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute."  State v. Vallejos, 123 N.M. 739, 741, 945 P.2d 957, 959 (1997), *quoting* Sorrells v. United States, 287 U.S. 435, 442, 53 S. Ct. 210, 212-13 (1932).  New Mexico also recognizes "objective entrapment," which involves either a factual finding that police conduct created a substantial risk that an ordinary person not predisposed to commit a particular crime would have been caused to commit that crime (regardless whether this particular defendant was so predisposed), or a legal finding that police behavior which might not ensnare the ordinary person nevertheless exceeded the bounds of permissible law enforcement conduct.  Baca v. State, 106 N.M. 338, 742 P.2d 1043 (1987); Vallejos, 123 N.M. at 743-44.

20.    There is nothing in the record to support the contention that Urias was ensnared by unacceptable police conduct.  At trial,[4] Olguin testified as follows:

21.    On October 27, 1995, Olguin stated that he was working as an undercover narcotics agent with the New Mexico State Police.  At the time, he had been working in narcotics for approximately 13 years.  (Tape CR-2-KE, at 6.04-7.42).  The State Police had put into place a drug interdiction operation entitled "No Mas," intended to reach beyond street sellers to the mid-level or higher level dealers.  (Id., at 8.06-9.15).  Olguin said that mid-level drug dealers do not normally like to sell drugs to new people for fear of being arrested.  (Id., at 32.14-34.53).

22.    At approximately 6:30 p.m. that day, Olguin met with Marquez at the Marquez residence and said he wanted to purchase some cocaine.  Olguin had purchased drugs from Marquez, and other members of the Marquez family, in the past.  Marquez said he would have to contact one of his "connections" – those who supply him with drugs to sell – to obtain the cocaine.  He told Olguin to contact him a short time later.  (Id., at 9.54-10.25, 21.30-22.20, 29.05).

23.    Olguin testified that he called Marquez back at approximately 8:00 p.m. that evening, and Marquez told him that his connection was there at the residence at that time, with the cocaine.  This conversation was not tape recorded.  Olguin then went to the Marquez residence with another undercover narcotics agent, Miguel Mendez ("Mendez").  Olguin noticed a blue Ford vehicle, which hadn't been there on their previous visit, parked near the Marquez home with a woman and small

---

[4]Urias' trial took place on September 10, 1997.  An earlier trial was held on June 2, 1997, but the court later set aside that conviction and granted Urias' motion for a new trial, based on contact between a juror and the court bailiff.  Trial tape references herein are to the September 10, 1997 trial.  Trial tapes will be referred to hereafter in the form: "Tape CR-1-KE, at 10.25."  The tapes were played on a Sony BM-75 Dictator/Transcriber, which has approximately 47.00 counters per side.

child inside.  The agents wrote down the license number of the Ford, on the assumption that it might

belong to the connection.  A check on the license later revealed that the car was registered to Urias

or to his wife, Stella.  (Id., at 10.48-11.37, 12.11, 24.10, 31.14; Tape CR-4-KE, at 6.15-6.56).  Urias

was later identified by Olguin and Mendez from a photograph.  (Tape CR-4-KE, at 7.24-7.32).

24.  Olguin further testified that when he and Mendez arrived back at the Marquez home,

Marquez called him into the mobile home and directed him to one of the bedrooms.  Urias, whom

Olguin identified in court, was in the bedroom.  Olguin did not know Urias' name at this point, but

he believed him to be the "connection" whom Marquez said would be at the residence.  Marquez and

Olguin discussed the cocaine purchase.  At one point, someone, either Olguin or Marquez, pulled

back the bed covers to reveal 8 packages of cocaine.  Olguin examined the cocaine, and explained

that he wasn't pleased with the quality of the cocaine.  It appeared to be "cut" with another

substance, which he was able to determine from the texture.  Olguin commented to Urias that the

cocaine seemed to be cut quite a bit, and Urias said in response that, yes, it had been cut, but it was

ready for resale.  (Tape CR-2-KE, at 11.52-14.02, 30.23).

25.  Mendez entered the room some time after Olguin.  Olguin said that he and Mendez

attempted to negotiate a lower price for the cocaine but were unsuccessful and eventually paid the

full asking price.  Olguin handed the money, $3,000, to Marquez, picked up the cocaine from the bed,

and put it in his pocket.  Olguin told Urias that he would get back in touch with him, if he had trouble

re-selling the cocaine or had complaints from customers about the poor quality.  Urias responded that

if Olguin had any problems with the cocaine, he should contact Marquez.  The two agents left the

residence, met with officer Clifford Frisk ("Frisk"), and gave him the cocaine for testing.  (Id., at

14.40-17.13).

26.  Olguin identified Urias in court as the person who was present in the bedroom and who made the statement that the cocaine was cut and ready for resale, and who told Olguin to get in touch with Marquez if he were not satisfied with the quality of the cocaine.  (Id., at 9.30-9.45).  Olguin said that Marquez later told him that Urias did not want to meet with Olguin but Marquez vouched for him, saying he was a cousin and that he'd known him a long time.  (Id., at 35.45-36.05).

27.  Olguin also testified that he was present when Urias was arrested, and that during a conversation at the police station, Urias offered to cooperate with the police and to assist them as an informant.  Olguin said further that he and Urias then engaged in a joking sort of conversation at the station, with Olguin saying that the last cocaine Urias had provided was poor quality, and Urias laughing and saying he would make sure the next cocaine was better than the last.  (Id., at 18.10-19.20).  This conversation was not tape recorded.  (Id., at 23.06-23.35).

28.  Mendez also testified at trial.  He stated that he and Olguin went to Marquez' home and discussed a cocaine purchase.  Marquez told him he had called his "connect," who assured him that he had plenty of cocaine.  Mendez said he and Olguin went back later to the Marquez home, where they saw a blue Ford vehicle with a woman and young child inside.  Marquez told Olguin to come inside, as his "connect" was there with the cocaine.  Mendez stayed outside, talking with Marquez' son, and a short time later, Marquez came to the door and asked Mendez to come in.  Mendez went to the bedroom, saw eight baggies of cocaine, and commented that the cocaine looked as if it had been cut a lot.  Urias was present in the bedroom at this time.  (Id., at 36.30-43.45).  Mendez confirmed the conversation, reported by Olguin, in which Olguin told Urias that if he wasn't satisfied with the cocaine, he would contact Urias, to which Urias replied that he should contact Marquez if he had any problems.  (Tape CR-2-KE, at 47.11 to end; Tape CR-3-KE, at 0.00-5.15).

13

29.  Urias did not testify in his own defense.  The only defense witness was Stella Urias, whose testimony did not touch on any entrapment issues. (Tape CR-3-KE, at 38.25-44.04).

30.  There is no evidence in the record that the narcotics agents who purchased the cocaine implanted in Urias' mind the notion of selling cocaine.  There is no indication that they engaged in conduct which created a risk that an ordinary person, not predisposed to crime, would have sold them cocaine, nor is there indication that their behavior exceeded the bounds of permissible law enforcement.  Urias contends in his petition that Marquez and Olguin "conspired to lure the petitioner" into involvement in the cocaine sale.  However, even if Marquez were cooperating with Olguin in order to reduce outstanding charges against him, this does not constitute entrapment as defined by New Mexico law.  Urias has, thus, failed to satisfy the first prong of <u>Strickland</u>.  It was reasonable for his attorney to forgo an entrapment defense, as the evidence "was not sufficient to establish that law enforcement officials unfairly caused the commission of the crime"; rather, the evidence indicated that "[a]ll they did was give Defendant the opportunity to commit the crime." <u>State v. Dartez</u>, 124 N.M. 455, 463, 952 P.2d 450, 458 (Ct. App. 1998).  "The court cannot conclude that . . . trial counsel was ineffective for failing to raise an entrapment defense where there was no evidence to suggest that such a defense existed."  <u>United States v. Pullen</u>, No. 98-40080-01-DES, 1999 WL 638249 (D. Kan. July 1, 1999).

31.  In addition, it was reasonable trial strategy for Urias' counsel to forgo the entrapment defense, in light of his decision to present the contradictory defense that Urias had nothing to do with the cocaine transaction and did not go to Marquez' home that night for any purpose involving illicit drugs.  Before a defendant can avail himself of an entrapment defense, he must admit to the offense. <u>United States v. Gibson</u>, 446 F.2d 719, 721-22 (10th Cir. 1971).  "[E]ntrapment is an affirmative

defense, ordinarily requiring admission that one engaged in the alleged acts . . .  Here, the Court believes counsel's decision not to pursue an entrapment defense was soundly reasoned in light of Petitioner's testimony that he was not involved in any drug trafficking whatsoever."  Stephens v. United States, 14 F. Supp. 2d 1322 (N.D. Ga. 1998).

> The decision to present an entrapment defense involves substantial risks in that it necessitates the admission by the defendant of the intent to commit the crime charged . . .  Thus, a defendant who pleads not guilty while asserting the affirmative defense of entrapment carries the risk that the jury will dismiss both theories.  In addition, the assertion of an entrapment defense opens the door to other evidence to demonstrate the defendant's propensity to engage in criminal conduct. . . .  Thus, the court will not view defense counsel as incompetent if he made a strategic decision not to raise an entrapment defense at the start of the trial, and later realized that his strategy was wrong.

United States v. Capozziello, 832 F. Supp. 532, 534-35 (D. Conn. 1993), *aff'd*, 28 F.3d 102 (2d Cir. 1994).

    32.  Gipson v. Lockhart, 692 F.2d 66 (8th Cir. 1982) involved a situation similar to that in the present case.  Gipson brought a federal habeas action, alleging his attorney was ineffective in failing to raise an entrapment defense in his prosecution for theft of a pickup truck.  At trial, Gipson denied planning or participating in the theft but stated that his alleged co-conspirator and a police informant had discussed a deal "and he had gone to the meeting place on Allred's suggestion to 'look at' a truck."  Id., at 67.  The court held:

> It is our view that the district court properly dismissed Gipson's petition claiming ineffective assistance of counsel in not investigating and raising an entrapment defense at trial and on appeal.  Gipson's tardy assertion of an entrapment defense contradicts his earlier testimony at trial where he contended he never talked with the police informant about stealing the truck.  During the trial Gipson took the stand and swore he had not committed the offense.  This testimony is inconsistent with the defense of entrapment.

Id., at 67-68. Although Urias did not take the stand in his second trial, his defense theory was that he had nothing to do with the drug transaction and was just "at the wrong place at the wrong time" (Habeas Petition [Doc. 1], at Addendum p.3), and "[i]t's been petitioner's contention all along that he was not involved in on [sic] any part of said transaction."  (Id., at 6).

33.  In Capps v. Sullivan, 921 F.2d 260 (10th Cir. 1990), the Tenth Circuit affirmed a decision by the District Court of New Mexico, granting a habeas petition on grounds that petitioner's trial attorney failed to raise the defense of entrapment.  In that case, however, the defendant took the stand at trial and admitted all of the elements of the crime, and although there was evidence to support an entrapment defense, his attorney failed to raise the defense, opting instead for a "jury nullification" strategy.  The court held:

> A reasonable trial strategy might have been to keep the defendant off the witness stand and attack the sufficiency of the state's case. Alternatively, a reasonable strategy might have been to have the defendant take the stand, as Capps did here, and seek an entrapment instruction.  But when a defendant takes the stand in his own behalf and admits all of the elements of the crime, exactly in accord with the court's instructions to the jury, it is surely inadequate legal representation to hope that the jury will ignore the court's instructions and acquit from sympathy, rather than to raise an entrapment defense that has some support in the evidence.

Capps, at 262.

34.  Urias' attorney chose a reasonable trial strategy in keeping his client off the stand and attacking the sufficiency of the state's case, and his performance did not constitute ineffective assistance of counsel.  The Court finds that the state court's decision on this issue was not an unreasonable determination of the facts in light of the evidence presented, nor was it legally unreasonable.

16

Claim Two: Trial Court's Evidentiary Ruling on Quintana Testimony

35.  In Claim Two, Urias contends that the trial court abused its discretion in refusing to admit the testimony of Urias' former attorney, Orlando Quintana, who would have testified that the accused co-conspirator, Marquez, told him that Urias was not involved in the drug deal.  This issue was raised on appeal, fully briefed, and rejected on the merits by the state court of appeals.  The issue never went to the state supreme court because, as noted above, no petition for certiorari was filed in the direct appeal.  In addition, this issue was not raised in Urias' state habeas petition.

36.  It appears, therefore, that Urias has procedurally defaulted this issue.  However, the State did not raise procedural default in its Answer, and although the Court could raise the issue *sua sponte*, Hardiman v. Reynolds, 971 F.2d 500, 502-505 (10th Cir. 1992), it declines to do so and will reach the merits of this claim.  In doing so, the Court does not consider whether the issue was "adjudicated on the merits" by the state courts for purposes of 28 U.S.C. § 2254(d) and therefore whether deference is necessary, since the Court finds that Claim Two would be dismissed on the merits in any event.

37.  When a petitioner asserts error in a trial court's evidentiary ruling as grounds for habeas relief, he must show that the court's action so infused the trial with unfairness as to deny due process of law.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991).  "It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial."  Maes v. Thomas, 46 F.3d 979, 987 (10th Cir. 1995).  Evidence is material if, in light of the record as a whole, the exclusion might have affected the trial's outcome by creating a reasonable doubt that would not otherwise have existed.  Richmond v. Embry, 122 F.3d 866, 874 (10th Cir.1997).

17

38.   The Court finds that exclusion of the Quintana testimony did not render Urias' trial fundamentally unfair.  Defense counsel Larsen made a proffer, on the morning trial began, of the testimony Quintana would provide if the court ruled it admissible.  Larsen told the court that Marquez, Urias' alleged co-conspirator, was unavailable to testify himself as he had apparently fled the jurisdiction and a warrant had been issued for his arrest.  Quintana was sworn in to make the proffer and testified that approximately a year before trial, at a time when he was representing Urias on the cocaine charges, Marquez came to his office along with Urias and asked whether Quintana could represent him, too.  Quintana stated that he explained to Marquez the conflict of interest problem that might arise if he were to accept Marquez as a client while also representing Urias.  Marquez' response, Quintana said, was that there was no conflict of interest because Urias had nothing to do with the cocaine sale and that he, Marquez, was solely responsible.  Quintana said also that Marquez told him he was aware of the consequences of his actions but would nevertheless be willing to make whatever statements were necessary to clear Urias.  (Tape CR-CH1-KE, at 5.40-13.25).

39.   The trial court rejected this testimony on grounds that its admission would violate attorney-client privilege, which Quintana would be obligated to raise under the circumstances, and also because there was no evidence corroborating Quintana's statements.  The New Mexico Court of Appeals found that the trial court's ruling was correct with regard to lack of corroboration, and the court therefore did not reach the issue of attorney-client privilege.  This Court agrees that lack of corroboration rendered the statements inadmissible.

40.   The Quintana testimony is hearsay, to the extent it referred to Marquez' statements that Urias was not involved in the cocaine transaction.  Urias argued on direct appeal, and argues in this

18

petition, that the statements came within the hearsay exception embodied in N.M.R.A. 11-804(B)(3),

because they were statements against interest, made by a person unavailable to testify himself.

Marquez was "unavailable"; he had absconded, his whereabouts were unknown at the time of trial,

and Urias' attorney was unsuccessful in his attempts to contact him.  Rule 11-804(B)(3) provides that

a statement will not be excluded by the hearsay rule, where an unavailable declarant made:

> [a] statement which was at the time of its making so far contrary to
> the declarant's pecuniary or proprietary interest, or so far tended to
> subject the declarant to civil or criminal liability ... that a reasonable
> person in the declarant's position would not have made the statement
> unless believing it to be true.  A statement tending to expose the
> declarant to criminal liability and offered to exculpate the accused is
> not admissible unless corroborating circumstances clearly indicate the
> trustworthiness of the statement.

41.  The court of appeals held that the requisite corroborating circumstances were not present,

for the following reasons.  Marquez' risk of prosecution was reduced considerably by the fact that

he fled the jurisdiction, thus reducing the factor that the statement "tended to subject him to criminal

liability" and eliminating the check of cross-examination.  The fact that Urias was present at the time

the statements were made does not tend to bolster the credibility of Marquez; indeed, it could be seen

as a coercive factor.  Quintana conducted no investigation into the accuracy of Marquez' statements,

nor did he confirm that the statements were made freely and without coercion or threats, by Urias or

someone else.  There is no indication in the record that Marquez made these statements at any other

time, or to any other person than Quintana.  Corroborating circumstances have been held to exist if

the declarant had no knowledge that his statements would be used to benefit the accused; in this

situation, Marquez' only apparent motive was to benefit Urias.  There are no other corroborating

circumstances which might have made this testimony admissible, and there was substantial evidence,

primarily the testimony of Olguin and Mendez, which contradicted the statement that Urias had nothing to do with the cocaine transaction.

42.  The exclusion of inadmissible, dubious evidence does not render a trial "fundamentally unfair."  The evidence at issue here was not sufficiently trustworthy to overcome the ban on hearsay, and under the circumstances, due process did not require that the jury hear Quintana's testimony.  Habeas relief is therefore not appropriate on this issue.

Claim Three:  Sufficiency of the Evidence

43.  Urias argues in Claim Three that the evidence was insufficient to sustain his conviction, in that the only evidence of his guilt came in the testimony of police officer Olguin.  The issue of sufficiency of the evidence was raised, in a fashion, on direct appeal.  Urias' attorney noted the issue in his docketing statement (Answer, Ex. D, at 5).  In its Calendar Notice proposing summary affirmance, the court of appeals reviewed the evidence, noting Olguin's testimony that  Urias was present in the bedroom when the cocaine was revealed and that Urias responded to Olguin's question about the purity of the cocaine, telling him that he needn't worry, that it was good cocaine.  The court stated:

> We propose to hold that testimony regarding Defendant's comments about the cocaine was sufficient to connect Defendant to the drug sale and to show Defendant and Marquez were working together to sell cocaine to Holguin [*i.e.,* Toby Olguin].  See State v. Herrera, 90 N.M. 306, 307, 563 P.2d 100, 101 (Ct. App. 1977) (inference of constructive possession of drugs can be drawn where there are incriminating statements or circumstances tending to support the inference).  Insofar as other inferences could be drawn from the evidence, indicating that defendant was not involved in the sale, the jury was entitled to reject those inferences.

(Answer, Ex. E, at 1-2).

44.  Urias submitted a memorandum in response to the Calendar Notice, arguing only the issue of the Quintana testimony; the issue of sufficiency of the evidence was not mentioned.  (Answer, Ex. F).  In light of this memorandum, the court of appeals assigned the case to the General Calendar. The briefing thereafter dealt only with the Quintana issue; neither party made reference to the issue of sufficiency of the evidence, and the court did not mention the sufficiency issue in its opinion affirming the conviction.  (Answer, Exs. G-J).  The claim was not presented to the New Mexico Supreme Court on direct appeal, because no petition for certiorari was filed.  The sufficiency issue was discussed in a cursory manner in Urias' "Brief in Support of Petition for Writ of Habeas Corpus" in state court (Answer, Ex. L, at 18), but it was not specifically raised as a distinct issue in the petition itself.  (Answer, Ex. K).  As noted above, the petition was denied summarily by the state district court, and certiorari was denied without comment by the state supreme court.

45.  As was the case with the issue of the Quintana testimony, the Court does not find it necessary to decide whether Urias procedurally defaulted this issue, or whether the issue was "adjudicated on the merits" for purposes of deferring to the state courts' determination, since the claim is clearly without substantive merit.

46.  In reviewing a challenge to the sufficiency of the evidence, the Court must decide "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).

> Such review is 'sharply limited' and a court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996), *quoting* Wright v. West, 505 U.S. 277, 296-97, 112 S. Ct. 2482, 2492-93 (1992).  "The test is this: on the basis of the whole record, '[t]he evidence - both direct and circumstantial, together with the reasonable inferences to be drawn therefrom - is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.'" United States v. Bowie, 892 F.2d 1494, 1496-97 (10th Cir. 1990).  The Court is not permitted, in reviewing a sufficiency claim, to weigh conflicting evidence or consider witness credibility but must accept the jury's resolution of the evidence as long as it is within the bounds of reason. Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993).

47.   The primary evidence against Urias at trial came in the testimony of Detective Olguin, set forth above.  This evidence was substantially confirmed by the Mendez testimony.  The prosecution also presented the testimony of Sergeant Clifford Frisk, who confirmed Olguin's and Mendez' statements that they handed the cocaine over to him after the purchase.  He stated further that the substance tested positive for cocaine in a field test, and that he delivered the substance to a DEA agent, who in turn sent it to the DEA laboratory in Dallas, Texas.  The parties had earlier stipulated to introduction of evidence of a lab report issued by the DEA, which established that the substance was indeed cocaine.  (Tape CR-3-KE, at 6.19-15.50).  On cross examination, Olguin acknowledged that no tapes were made of any of his conversations with Marquez or Urias, that he had no "back up proof," and that is basically "my word" as to what transpired and what Urias said and did.  The jury chose to believe Olguin, and the Court cannot say, viewing the evidence as a whole, that no reasonable jury would have done so.

48.   The statute under which Urias was convicted, N.M.S.A. (1978) § 30-31-20, defines

"trafficking" as the "distribution, sale, barter or giving away" of a controlled substance that is a narcotic drug.  To prove trafficking in cocaine, the State must show that the defendant transferred or caused the transfer of cocaine to another person, that the defendant knew or believed at the time that the substance was cocaine, and that this happened in New Mexico on a particular date.  N.M. U.J.I. 14-3110; Martinez v. State, 91 N.M. 747, 749, 580 P.2d 968, 970 (1978).  A conviction for trafficking in a controlled substance may be sustained by circumstantial evidence, State v. Chouinard, 96 N.M. 658, 660, 634 P.2d 680, 682 (1981); however, the evidence must show some conduct, declarations or actions on the part of the defendant from which the jury could fairly infer that he had knowledge of the presence and nature of the narcotics.  State v. Garcia, 76 N.M. 171, 176, 413 P.2d 210, 213 (1966).

49.  A conviction for conspiracy requires that the defendant and another person, by words or acts, agreed together and intended to commit the crime.  N.M. U.J.I. 14-2810.  The agreement may be shown by circumstantial evidence, and by acts demonstrating that the conspirators knew of and participated in the scheme.  State v. Deaton, 74 N.M. 87, 89, 390 P.2d 966, 967 (1964).

50.  A reasonable jury could have inferred from the evidence that Urias was the "connection" whom Marquez said he was going to call to obtain cocaine for sale to Olguin and Mendez.  The jury could have concluded that Urias came to Marquez' home for the purpose of delivering cocaine for resale, that Urias was familiar with the appearance of cut and uncut cocaine, that he took the responsibility of telling Olguin that the cocaine was ready for resale, and that Urias and Marquez conspired together to sell the cocaine.  Urias argues that his statement, to the effect that Olguin should contact Marquez if he were unhappy about the quality of the cocaine, tends to show that he had nothing to do with the sale and that the transaction was Marquez' alone.  However, it would not

23

be unreasonable for the jury to conclude from this evidence that Urias was a mid-level dealer who generally kept himself aloof from direct contact with street sales and did not want to be contacted by an unhappy purchaser, leaving that unpleasant task to his co-conspirator, a person lower in the chain of drug dealing.

51.  A reasonable jury could have found that the State established all elements of the crimes of cocaine trafficking, and conspiracy to traffic, beyond a reasonable doubt.  The evidence was sufficient to convict, there was no due process violation, and habeas relief is not appropriate on this issue.

<u>Claim Four:  Due Process in INS Proceedings</u>

52.  In Claim Four, Urias asserts that, although he is a Mexican national, he has been a permanent resident of the United States since 1982.  Following his conviction, he received notice from the Immigration and Naturalization Service informing him that he would be deported at the conclusion of his sentence.  The Final Administrative Order states that Urias is not a permanent resident; he contends this is incorrect.  He says further that he did not receive a hearing on the deportation issue and has never been informed of any right to appeal the order.

53.  In essence, Urias argues lack of due process in the deportation proceedings, a claim with constitutional dimensions:

> it is not competent for . . . any executive officer . . . arbitrarily to cause an alien who has entered the country . . . although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States.  No such arbitrary power can exist where the principles involved in due process of law are recognized.

<u>Kaoru Yamataya v. Fisher (The Japanese Immigrant Case)</u>, 189 U.S. 86, 101, 23 S. Ct. 611, 614-15

(1903).  *See also*, de la Llana-Castellon v. INS, 16 F.3d 1093, 1096 (10th Cir. 1994) ("noncitizens,

even those charged with entering the country illegally, are entitled to due process when threatened

with deportation . . . the fundamental requirement of due process is the opportunity to be heard at

a meaningful time and in a meaningful manner") (internal punctuation omitted).

54.  Respondents contend that all of Urias' claims were decided on the merits in the state

courts.  The deportation issue was not raised on direct appeal, although Urias did mention it in his

state habeas petition, noting that he "brings this issue to this particular court for reason being that it

appears he has no further judicial review of this issue.  There remains no other forum by which he can

raise the issue."  (Answer, Ex. L, at 20).  Both the trial court and the state supreme court denied his

habeas petition in its entirety without comment.  The state courts did not explicitly rule on the

deportation issue, but this fact is of no moment, as challenges seeking review of a final INS

deportation order are appropriately brought in federal court by means of a petition under 28 U.S.C.

§ 2241.  *See*, INS v. St. Cyr, 121 S. Ct. 2271, 2001 WL 703922, at *11  (2001); Jurado-Gutierrez

v. Greene, 190 F.3d 1135 (10th Cir. 1999), *cert denied,* 529 U.S. 1041, 120 S. Ct. 1539 (2000).

55.  Urias has styled his initial pleading as a petition under § 2254, not § 2241.  However, he

makes reference to § 2241 in the body of his petition and in any event, a *pro se* litigant's

characterization of his claim is not conclusive on the Court.  Roman-Nose v. N. M. Dept. of Human

Svcs., 967 F. 2d 435, 437 (10th Cir. 1992).  The Court will construe Urias' Claim Four as a § 2241

claim seeking review, on constitutional grounds, of a Final Administrative Removal Order under the

Immigration and Nationality Act.  No Answer to Claim Four has been filed by the appropriate

Respondent, and the Court therefore recommends that the acting INS Commissioner be named as a

Respondent and that the United States be ordered to answer the petition with regard to this claim.

## **Recommended Disposition**

That Claims One, Two and Three of Urias' petition be dismissed with prejudice and that, with

regard to Claim Four, the Court enter an order as follows:

1.  that Urias' petition be construed as a petition under 28 U.S.C. § 2241, as concerns
petitioner's Claim Four raising issues of lack of due process in deportation proceedings;

2.   that the Clerk add Kevin D. Rooney, Acting Commissioner of the United States
Immigration and Naturalization Service, as a named Respondent;

3.  that the Clerk forward to the United States of America and Respondent Rooney copies
of the petition for writ of habeas corpus and supporting papers and exhibits, together with a
certified copy of the order; and

4.  that the United States of America answer Petitioner's petition for writ of habeas corpus
within twenty-three days of receipt of the order.

Lorenzo F. Garcia
United States Magistrate Judge